603 So.2d 693 (1992)
Alex SUTTON, Appellant,
v.
Thomas E. SMITH, Mitchell Shammas, Michael P. O'Neill and Charles Furrer, individually and d/b/a ARS & Associates, a Michigan partnership, Appellees.
No. 91-2524.
District Court of Appeal of Florida, First District.
August 21, 1992.
*694 John Paul Howard, Jacksonville, for appellant.
Frank M. Scruby, Orange Park, for appellees.
ZEHMER, Judge.
Alex Sutton appeals a final order dismissing his action for breach of contract based on the trial court's ruling that it lacks personal jurisdiction over Appellees. We hold that the trial court erred in dismissing the action for lack of jurisdiction because the sworn complaint and the affidavit filed by Appellees in support of their motion to dismiss established as a matter of law that Appellees entered into a joint business venture with Sutton that contemplated and actually involved substantial performance of activities in furtherance of the joint venture in Florida.
Sutton, a professional golfer who formerly resided at the Ravines Golf Course in Middleburg, Florida, sued Appellees, Thomas E. Smith, Mitchell Shammas, Michael P. O'Neill, and Charles Furrer, individually and doing business as ARS & Associates, a Michigan partnership, in the court below. The suit claimed damages allegedly resulting from Appellees' breach of a sponsorship agreement between ARS & Associates and Sutton. The complaint was duly sworn to by Sutton and alleged the following facts.
Prior to May 1, 1990, defendant Smith, the managing partner of ARS & Associates, and defendant Shammas came to the Ravines Golf Course, where Sutton was a resident golf professional, and entered into an oral agreement with Sutton to sponsor him on the senior PGA tour. After the terms and conditions were agreed upon, defendant O'Neill, an attorney, prepared a written agreement and sent it to Sutton in Florida where Sutton executed it. Sutton returned the agreement to O'Neill in Michigan where he and the remaining partners of ARS & Associates executed it. Thereafter, O'Neill sent the conformed copy of the agreement to Sutton who ultimately made it an exhibit to the sworn complaint.
The agreement, titled "Sponsorship Agreement," provided for a term from May 1, 1990, to December 31, 1990, subject to termination, extension or renewal as specified therein. Sutton agreed that during the term of the contract he would "play golf on the SENIOR PGA TOUR and engage in activities related to golf only for the benefit of the parties to this agreement." In return, the partnership agreed to compensate Sutton "for his expenses during the term of this agreement as more specifically set forth hereafter and Player [Sutton] agree[d] to render his full time services and to participate in as many golf tournaments as reasonable." The agreement stated further:
For Player's competing in such tournament during the term of this contract; the option hereinafter set forth giving Partnership the right to renew this contract; and all other undertakings of Player herein, the Partnership promise[d] to pay Player's proper and necessary expenses including the reasonable board and lodging expenses of the Player while playing in golf tournaments, transportation costs to and from tournaments, monthly rental and food expenses not to exceed ($830)) per month, and health care insurance not to exceed ($2000) per year, anything herein to the contrary notwithstanding. Partnership shall not be obligated to contribute more than Sixteen Thousand ($16,000) Dollars per year.
The Partnership was given the option to renew the agreement, "in their sole discretion," for another year through December 31, 1991. The agreement further recited that Sutton

*695 agree[d] that all income he receives, including but not limited to, lessons, exhibitions, television endorsements, tournament winnings, corporate outings, etc., shall be paid into the Partnership [ARS & Associates]. Player shall be required to furnish the Partnership with an itemized accounting of all income and expenses on a weekly basis. Player's income shall be apportionable as follows and in the following order:
(1) Reimbursement to Partnership of all Player and Partnership expenses;
(2) Distribution of balance as follows: 50% to Alex R. Sutton [and] 50% to ARS & Associates
Partnership shall have the sole discretion as to the release of funds but in no event, shall funds be distributed any later than December 31, 1990.
The agreement further recited that Sutton
has special, exceptional and unique skill and ability as a professional golfer, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages and, therefore, agrees that Partnership shall have the right, in addition to any other rights which the Partnership possess[es], to enjoin him by appropriate injunction proceedings against playing professional golf without the consent of the Partnership, or engaging in activities related to golf for any person, firm, corporation, institution or on his own behalf, and against any other uncompensable breach of this contract.
The agreement contained provisions for termination and notice, recited that this written agreement "sets forth the entire agreement between the parties," and recited that the agreement is to be governed by the laws of the State of Michigan. Paragraph 14 recited that Sutton "agrees to and will instruct and authorize the PGA or any governing body or tournament sponsor or individual or agency in charge of a tournament whereby winnings are received, to directly deposit all such winnings into the Partnership [ARS & Associates] account."
The sworn complaint alleged that under the sponsorship agreement disbursement of funds generated by Sutton's golfing efforts and deposited to the ARS & Associates account were subject to defendant Smith's sole control as managing partner; that pursuant to the agreement, the partnership made contributions to the partnership fund to finance Sutton's activities, and Sutton deposited his earnings in the sum of $18,476 into the Partnership Fund; that Sutton's earnings were deposited pursuant to instructions given to the PGA at Ponte Vedra Beach, Florida, that all such earnings were to be paid directly to defendant Smith as managing partner; and that Smith in turn made deposits in Sutton's bank account in Middleburg, Florida. According to the complaint, between May 1 and September 30, 1990, Smith made at least sixteen such deposits into Sutton's account.
The sworn complaint further alleged that Sutton obtained an application and information necessary for him to get health care insurance through the PGA Touring Association at an annual cost of approximately $2000 per year, but that:
9. When plaintiff [Sutton] submitted this application and information to the Partnership through THOMAS E. SMITH, the managing partner, the Partnership rejected the same and plaintiff was instructed by defendant, THOMAS E. SMITH, plaintiff could obtain adequate insurance coverage at a lesser cost through Jim McCumber at the Ravines Golf Course, Middleburg, Clay County, Florida. Plaintiff immediately applied for such insurance. It was then determined that the nature and kind of health insurance which was available through the McCumbers' organization was tied to local medical facilities and doctors and would be of no benefit to plaintiff as a touring pro constantly on the move throughout the United States. He advised THOMAS E. SMITH, as managing partner of the Partnership, of this but the Partnership refused to obtain health coverage for the plaintiff as previously requested by him.
According to the complaint, thereafter on August 10, Sutton was diagnosed with a *696 cancerous growth on the forearm that had to be surgically removed and contacted defendant Smith about it. Smith "advised him that no health insurance coverage had been obtained for the plaintiff and that plaintiff should work some kind of plan with a treating physician in Florida to give the physician free golf instructions in return for the surgery." Sutton worked out such an arrangement with a physician in Ocala, Florida, who even permitted Sutton to reside in his home in Ocala for four days following the surgery, without charge in return for the golf lessons. The complaint continues:
11. Still believing the Partnership was in the process of obtaining medical health coverage pursuant to the Sponsorship Agreement and as it had sole control of all of the funds, plaintiff continued to honor his promises under the Sponsorship Agreement by entering senior PGA events, including 2 in Florida, 1 in Melbourne September 28, 1990, and 1 in Sarasota, November 6, 1990, plus giving golf lessons to Smith and Shammas at the Ravines on 2 days in October 1990 and giving Smith one complete set of Wilson Golf Clubs.
Sutton then alleges that he suffered a heart attack on November 27, 1990, while playing in a senior PGA tournament in Palm Springs, California. He contacted defendant Smith and learned that the partnership still had not obtained any health insurance for him. Sutton was required to assign his prize money of $15,000, payable at the end of the year, to the hospital to secure payment of monies necessary to cover his open heart surgery. Sutton alleges that he owes more than $100,000 for the surgery and related expenses that he cannot pay because the partnership did not pay for the necessary health insurance as it was required to do under the sponsorship agreement. For this reason, he sued ARS & Associates and its individual members to recover damages for breach of the sponsorship agreement.
Appellees moved to dismiss the action for lack of personal jurisdiction over them, alleging that (1) the individual defendants are residents of Michigan and are not, and never have been residents of Florida; and (2) the allegations of the complaint do not establish that the individual defendants or the partnership ever transacted business in Florida "so as to bring into play the Florida long arm statute." The motion was accompanied by a single affidavit made by defendant Smith on personal knowledge that recited in pertinent part: (1) ARS & Associates was formed at the end of April 1990; (2) in March 1990, while vacationing in Florida, Smith became aware that Sutton was looking for a sponsor for the Senior PGA Tour, and when he returned to Michigan in April, he discussed this matter with some other individuals to determine if they were interested; (3) Smith left Florida in March 1990 and did not return to Florida until the end of 1990; (4) shortly after his return to Michigan in April he received a call from Sutton to inquire if there was any interest in sponsoring him; (5) during April, Smith had many telephone conversations with Sutton exchanging information "which led to a consideration to determine if the Sponsorship agreement was feasible," and an "agreement to sponsor [Sutton] was not discussed until April 14, 1990 at which time we conducted an extensive long distance telephone conversation and negotiated the terms that led to the written Sponsorship Agreement"; (6) the written agreement was mailed to Sutton for his signature and returned to Michigan for acceptance by the Partnership under the date April 27, 1990; and (7) the "only activity of the Partnership that even indirectly related to [Sutton] was to instruct our local bank to make deposits in Mr. Sutton's Florida bank account."
After considering the verified complaint and the Smith affidavit, the trial court granted the motion to dismiss. The order made limited findings of fact that essentially were consistent with the allegations in the complaint and the affidavit. The trial court ruled that the facts alleged in the complaint were not sufficient to show that Florida's long-arm statute is applicable, in that the facts did not show that Defendants transacted business in Florida or breached a contract in Florida by failing to perform *697 acts required by the contract to be performed in Florida. The court further ruled that Defendants had presented a meritorious challenge to personal jurisdiction by filing a motion to dismiss with a supporting affidavit stating that they had never transacted business in Florida, and that it then became incumbent upon Plaintiff to support his assertion of personal jurisdiction; but, since Plaintiff rested on the allegations of his complaint, he failed to carry that burden. Alternatively, the court ruled, even if Plaintiff had sufficiently alleged a statutory basis for personal jurisdiction, assertion of personal jurisdiction over Defendants would offend traditional notions of fair play and substantial justice because there was no basis to find that Defendants' conduct in connection with Florida was such that they could reasonably anticipate being haled into a Florida court. In short, the court ruled, Plaintiff had not met the requirements set forth in Venetian Salami Company v. J.S. Parthenais, 554 So.2d 499 (Fla. 1989).
Appealing the order of dismissal, Sutton argues that the trial court erred in ruling that the facts established by the complaint and affidavit are legally insufficient to show personal jurisdiction over Defendants. He argues that the undisputed facts shown thereby are sufficient to establish jurisdiction over the non-resident defendants pursuant to section 48.193(1), Florida Statutes (1991). That statute provides in pertinent part:
(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself and, if he is a natural person, his personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
(a) Operating, conducting, engaging in or carrying on a business or business venture in this state or having an office or agency in this state.
* * * * * *
(d) Contracting to insure any person, property, or risk located within this state at the time of contracting.
* * * * * *
(g) Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.
Sutton argues that jurisdiction was established under each of these subparagraphs of section 48.193(1), and that, in any event, the court erred in not granting an evidentiary hearing to resolve disputed facts.
Although the Smith affidavit obviously disputed certain facts in the sworn complaint, we conclude that the undisputed facts were sufficient to support the trial court's exercise of personal jurisdiction over Appellees under section 48.193(1)(a), Florida Statutes (1991), and thus do not reach Appellant's arguments regarding subparagraphs (d) and (g). We further find that the undisputed facts establish that Appellees had sufficient "minimum contacts" with the Florida to satisfy the due process requirements.
The appropriate procedure for resolving questions of personal jurisdiction was set out by the supreme court in Venetian Salami Company v. J.S. Parthenais, 554 So.2d 499 (Fla. 1989). First, the trial court must determine whether the plaintiff has alleged sufficient jurisdictional facts to bring the action within the ambit of the section 48.193, Florida Statutes, the Florida long-arm statute. Assuming the plaintiff has alleged sufficient facts to bring the action within the ambit of that statute, the trial court must then determine whether the defendant has sufficient "minimum contacts" with Florida to satisfy due process requirements. The defendant may challenge the legal sufficiency of the allegations of the complaint or raise the contention of a lack of minimum contacts by filing a motion to dismiss, but must support his position by affidavit. The burden then shifts to the plaintiff to show, by affidavit, the basis upon which jurisdiction may be obtained. Plaintiff may satisfy this requirement by initially filing a sworn complaint as in this case, provided the allegations of the complaint fairly meet the contentions *698 of the defendant. If the essential facts stated in the affidavits are not conflicting, the trial court can resolve the legal issue on the basis of the affidavits. However, if the essential facts are shown to be in direct conflict, the trial court must hold an evidentiary hearing to resolve all disputed facts essential to determining the jurisdictional issue.
We accept the verified complaint filed in this case as satisfying the affidavit requirement on the plaintiff, since the sworn allegations fairly meet the contentions of defendant Smith's affidavit. As the facts essential to resolving the jurisdictional issue in this case are established by the sworn complaint and the Smith affidavit, we must first identify the alleged facts that are in direct conflict to determine whether they are essential to resolving the jurisdictional issue. In doing so, we note that no other individual defendant filed an affidavit controverting the allegations of the complaint. The Smith affidavit does not directly conflict with many of the material allegations in the complaint, as most of the facts stated therein are consistent with the sworn complaint. Smith disputes, however, that an oral agreement for the ARS & Associates partnership to sponsor Sutton was made in April while he was in Florida. Smith also appears to dispute that he was in Florida in October 1990, as alleged in the complaint, saying that he returned to Florida at the end of 1990.
Taking the allegations in the Smith affidavit as true, it appears that the negotiations between Sutton and ARS took place through phone calls by Sutton in Florida to Defendants in Michigan. Likewise, it is clear that the written sponsorship agreement was consummated in Michigan when Appellees received it from Sutton and executed it there. We do not consider these disputed facts to be material to our decision, however, because the jurisdictional question is not exclusively governed by where the agreement was made. We conclude that the sponsorship agreement, wherever made, created a joint business venture between Appellees and Sutton that contemplated and in fact involved significant performance in Florida and thereby subjected all parties to that joint business venture, including Appellees, to personal jurisdiction by Florida courts in respect to causes of actions arising out of the joint venture activities in Florida.
The sponsorship agreement contemplated that both Sutton and ARS & Associates would perform certain duties for their mutual benefit and that both would share equally in the net profits from the joint undertaking. Likewise, the agreement contemplated that should the joint undertaking fail, both parties would share the losses: ARS & Associates would suffer a loss of the capital invested in the venture, and Sutton would have exercised his skills in vain. The relationship, obligations, and rights created by the sponsorship agreement that is the subject of this case satisfy the legal definition of a joint venture. See Kislak v. Kreedian, 95 So.2d 510 (Fla. 1957) (In addition to the essentials of an ordinary contract, a contract creating a joint venture must show "(1) a community of interest in the performance of the common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits, and (5) a duty to share in any losses which may be sustained."); Berger v. Mead, 338 N.W.2d 919 (Mich. Ct. App. 1983) ("A joint venture has six elements: `(a) an agreement indicating an intention to undertake a joint venture; (b) a joint undertaking of; (c) a single project for profit; (d) a sharing of profits as well as losses; (e) contribution of skills or property by the parties; (f) community interest and control over the subject matter of the enterprise.'"). See also 48 C.J.S. Joint Adventures § 2 (1981); 8 Fla.Jur.2d Business Relationships § 682 (1978).
The parties to the sponsorship agreement contemplated that substantial activities to further the joint venture would take place in Florida. Sutton lived in Florida, and he was expected to and did play in tour events in Florida. Sutton was to be provided health care insurance in Florida, and the conduct of the representatives of ARS & Associates, alleged in the complaint and not disputed in the Smith affidavit, confirm that such insurance was to be provided in Florida. All earnings from Sutton's golf-related *699 activities in Florida and elsewhere were to be paid by the PGA from its head-quarters and bank account in Florida to the ARS & Associates partnership account in Michigan; the partnership was required to disburse funds from the partnership account to Sutton's bank account in Florida so as to enable him to perform golf-related activities and participate in tour events for the benefit of the joint venture. After ARS & Associates failed to fund health insurance for Sutton, the partnership instructed Sutton to obtain medical care in return for providing golf lessons to the physician in Florida, an act consistent with the intent of the agreement that Sutton transfer all compensation received from golf-related activities to the partnership for the benefit of the joint venture. These undisputed facts place the joint business venture within the ambit of section 48.193(1)(a), Florida Statutes (1991), as they show that the members of the joint venture were operating, conducting, engaging in, or carrying on the business venture in Florida.
Having found sufficient undisputed jurisdictional facts to bring the action within the ambit of section 48.193(1)(a), we turn now to the remaining inquiry, as set out in Venetian Salami, into whether Appellees had sufficient minimum contacts with Florida to meet due process requirements. As the undisputed facts previously discussed show, the agreement for joint venture at issue in this case contemplated and actually involved performance in substantial part within Florida. Where an agreement for joint venture made outside the forum state contemplates and results in performance in substantial part within the forum state, the non-resident members of the joint venture have exercised sufficient minimum contacts within the forum state to support the forum state's exercise of personal jurisdiction over them. Levinson v. Wister, 742 P.2d 1024 (Nev. 1987) ("Where a contract for joint venture between resident of forum state and non-resident contemplates that the resident member will perform substantial services within the forum state, such performance is sufficient to justify exercise of personal jurisdiction over the non-resident member."; Thorpe v. McCaffrey, 157 A.D.2d 879, 549 N.Y.S.2d 881 (N.Y. App. Div. 1990) (Where non-resident member of joint venture clearly reached out to create continuing relationship and set of legal obligations with citizen of Virginia, minimum contacts requirements necessary for exercise of personal jurisdiction by Virginia court were met). See also Burger King v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (Sufficient minimum contacts necessary for the exercise of personal jurisdiction exist where a defendant purposefully avails himself of the privilege of conducting business in the forum state and thereby invokes the benefits and protections of the law of the forum state.). Furthermore, all members of a joint venture are bound by the actions of one of the members, provided that such member's actions relate to the joint venture and do not exceed the scope of his authority. Nichols v. Bodenwein, 107 Fla. 25, 146 So. 86 (1932), reh'g den., 107 Fla. 25, 146 So. 659 (1933); McKissick v. Bilger, 480 So.2d 211 (Fla. 1st DCA 1985); Summers v. Hoffman, 69 N.W.2d 198 (Mich. 1955); Davidson v. State, 201 N.W.2d 296 (Mich. Ct. App. 1972). See also Kelly v. State, 597 So.2d 900 (Fla. 3d DCA 1992) (Law is well established that "partners, acting within their authority and in pursuit of partnership business, bind all other partners and act as their agents."). We therefore conclude that the partnership of ARS & Associates and each of the individual members of ARS & Associates exercised sufficient minimum contacts with Florida to satisfy due process requirements by entering into a joint venture agreement with Sutton that contemplated and resulted in performance in substantial part within Florida.
We hold that the trial court has personal jurisdiction over Appellees as a matter of law, reverse the final order of dismissal, and remand for further proceedings on the complaint.
REVERSED.
WOLF and KAHN, JJ., concur.